The next case for today is 2016-60448 ExxonMobil Pipeline Company v. United States Department of Transportation et al. You may proceed. May it please the Court, Reagan Simpson for ExxonMobil and Rich Farrar as well. ExxonMobil fully supports pipeline safety. What ExxonMobil opposes in this case are unfounded violations and penalties pertaining to the Pegasus Pipeline that had a safe history of operation for 65 years and had one regrettable but unpreventable release. Unpreventable because the release resulted from a unique manufacturing defect that evaded detection through three hydro tests and through a sophisticated seam crack tool that was run virtually on the eve of the release. The counsel on the other side talks about the long history of leaks on this pipeline. Only one in-service leak, as I recall, but several during testing. What about that? Well, the purpose of hydro testing, and this is explained by Dr. Kueffner in his affidavit, particularly his supplemental affidavit at paragraph 11. He says that when you do a hydro test, what happens is you have brittle cracks that will develop over time. Are those cracks in that history of leaks at seams or some of them elsewhere in the pipes? Those were described as seam failures. Now, the one in-service failure was two gallons. It's a question of whether that's even an in-service failure. I hope you rushed to plug that one. I'm sorry? You rushed to plug that one, I guess. That's correct. That's correct. PHMSA, in its performance-based regulations, says that operators are to consider pipeline safety risks. As to seam failure susceptibility, what PHMSA says is you should consider risks that are identified in a particular methodology. PHMSA says it makes rules by adjudication. Let me direct the Court to one of the adjudications by PHMSA that's in our brief at pages 14 to 15, in Ray Kinder Morgan. And here is the rule that PHMSA announced to the industry. Dr. Kiefner's methodology is sufficient to establish the industry guidance to determine the susceptibility of ERW pipe, this pipe, to seam failure. And then it drops footnote five that gives a historical discussion of the fact that Dr. Kiefner's methodology, and I'll just quote, the Baker study, which we call the Baker report, was conducted in association with Dr. Kiefner, and the susceptibility analysis described in the Baker study is only a slightly updated version of the analysis methodology Dr. Kiefner presented. And the Baker report is commissioned by the Office of Pipeline Safety. It was. It is referenced at pages 28 and 29 of the PHMSA enforcement manual. So what PHMSA is telling the industry and what it told ExxonMobil is there is a methodology for determining susceptibility to seam failure, and it is in the Baker study, which is based on Dr. Kiefner's methodology. Counsel, opposing party mentioned several times in this brief, so it must be important to them, and you respond once, that page 20 of the Baker's report has, I think you call it a sentence fragment. It's interesting what counsel can come up with, but it does say if a seam-related in-service hydrostatic test failure has occurred, the segment is considered susceptible. Now, that's a page or two before the decision tree, page after the decision tree, somewhere in there, so it's all talking about the same thing. Give me a more fulsome explanation of why that's not actually what the government wants to make of it. It's interesting, Judge Southwick, that in the final order I just quoted from in Ray Kinder Morgan, the PHMSA starts off saying, well, this is susceptible to seam failure, and then it says, here's the way you determine susceptibility to seam failure. We all know that there is a proneness in this pipeline to seam failure. That's why there's a special methodology that is used. But if that was the only test, whether you had failures in hydrotests, then there will be no reason for the rest of the report, which goes on at length to say you have to look at the causes. There's not an abstract definition of seam failure. That's not what we're looking for, and that's not what the regulations are looking for. What the regulations are saying is we want to set up a continual assessment, if this is susceptible to seam failure, looking in the future. And that's the whole point of the Baker Report is looking at time-dependent defects, whether you have fatigue or whether you have corrosion, because then we can pinpoint those, we can predict those, and we can prevent those because we develop a prediction about the life of the pipeline. So it's not an abstract concept. So you're agreeing that the regulation is clear? The regulation, of course, tells nobody how to determine susceptibility to seam failure. And what we're saying here is the agency in the future. And I'm asking whether or not you're agreeing that the regulation is clear, because if it's ambiguous, then we have to do a whole we've got to go down a different path, don't we? Yes and no. The regulation is clear. Yes and no. All right. The regulation is clear. I've got my hands. Okay. Well, could you be more fulsome? I want to hear the yes and no. Well, what I'm saying is that the regulation is clear in that it does not, it clearly does not define how you determine susceptibility to seam failure. And what PHMSA has then told the industry in its adjudication is that the way to determine susceptibility to seam failure is to use Dr. Kiefer's methodology, which became the Baker report. I think what you're saying is key, that they have told you to use that methodology. What has been said in the briefing is, in fact, there's arguably an inconsistency between the regulation and the Baker report, because the regulation requires you to be alert to these sort of risk factors that your testing showed from their viewpoint that the pipe had, as proven by the leak. Of course, that's post hoc. And to me, that there is a difficulty in the government's argument, but it's not beyond the pale, that, in fact, the overriding obligation on the part of everyone is to be alert to the risk factors of a particular pipe, as shown by a variety of things, including what was shown by your testing. What is your best statement from the government prior to this leak, that if you follow the Baker report, follow the decision tree, you're in a safe harbor? Because in Ray Kinder Morgan, the agency said, this is how you determine seam susceptibility, the Kiefer methodology, which became the Baker study. In section 4.3 of the Baker study, it says, the means of determining whether or not the seam of a particular pipeline is susceptible to failure are illustrated in figure 4.1. And it goes on to say, figure 4.1 represents a decision tree that allows one, by supplying appropriate data, to determine if a seam integrity assessment is required based on the federal pipeline regulations. So what PHMSA has done is said, we're not telling you the regulations, and it's very clear, we're not telling you the regulations how to determine susceptibility to seam failure. What we're doing is we're telling you that there is a methodology out there that is sufficient for you to use to determine susceptibility to seam failure. And you look at that particular document and it says, the means for making that determination is using figure 4.1. And we have used figure 4.1 over and over. So the agency's interpretation of its regulation is the Baker report. The agency, and this is why deference really may not matter too much in this case. Well, that's where I'm headed. Let me explain that. Because when you say, this is what you can do to determine susceptibility to seam failure, and then you do it, as Exxon has done a number of times, even hired the guy who came up with the methodology to make sure they were doing it right and was audited by PHMSA while he was doing it. And when the agency says, this is what you can do to determine this key fact in the regulation, that we're not telling you the regulation, then if you do it, you cannot be held to have violated or to be subject to a penalty, because that would be an unfair surprise for the agency to say, this is what you can do, we do it. But you're not arguing that it's not possible to misinterpret the agency's interpretation, are you? Couldn't you misinterpret it or misapply it? Well, it seems very clear, Judge. It is clear. You're telling me the Baker report is clear? No. Oh, all right. No. Well, I'm saying that the Baker report clearly says that figure 4.1 is the means for making this determination. The agency says this is what you can do. How many pages does the Baker report? Over 100. And it has something called a decision tree. And the report says the means for determining this under the federal regulations, this is commissioned by the Office of Pipeline Safety, and it says the means are all within figure 4.1, which we did over and over again, and we even hired the man who wrote the methodology that is endorsed and is part of the adjudication in Kinder Morgan to make sure we were doing it correctly, and we went even beyond that by not just relying upon figure 4.1 and doing it multiple times, but we also ran a seam crack tool we weren't required to run. Frankly, this is the frustration of my client. We're told to use this methodology. We look at the report and it says this is the means for making this determination. We use it over and over again. We hire the guy who came up with the methodology to make sure we're doing it correctly, and he designs our entire program. We do more than is required because we do end up running a seam crack tool that is not required unless you make the determination. There is no criticism of how we did 4.1 in this case, how we did the methodology. The criticisms, as I understand them, are a reliance on a presumption that doesn't exist, that they even argued opposing a stay in this case, and it was called the black letter at page 103 of the hearing testimony or informal hearing, when it's not even applicable. They say that, oh, well, the Baker methodology shouldn't be applied to brittle pipe. Well, you look throughout the Baker report, and particularly in the full copy, not the copy that's just in the record, it talks about brittleness everywhere. So back to deference, are you saying then that it doesn't matter if we give deference to the agency's interpretation of its regulation, or are you saying we shouldn't give any deference to it? I'm saying that my point is that agency deference is not looked to when the agency tells someone to do something, and then you do it, and they say you violated. That's the unfair surprise. Gomez v. Lynch, this Court, very recently said there are a number of exceptions to agency deference. And the exception in this case is they told us how to do it, we did it, we got the guy who came up with the methodology to tell us how to do it, and we did more than we were required to do. It's now an unfair surprise to say we violated the regulations. So even if there was some room for our deference, correct? And that's the type of deference we're talking about is our deference. That a recognized exception to our deference is the danger of unfair surprise, and you do not utilize our deference when there is unfair surprise. Is that correct? That's correct. Is that your position? Yes, that's correct. But you have a first position before you get to our deference that you did what was required, so it's not — there's not room for deference. Is that correct? That's correct. I'm just trying to make sure that I have your argument. Let's look at this case, too, because you're talking about our deference, which is deference to the interpretation of the regulations. There's nothing that says there's agency deference to the third-party report that they commissioned. And let me make it clear. We're not arguing in this case. We're not here in lots of, as in many situations, saying we're trying to block a new rule or please give us more time to comply with a rule. Exxon wants to know what it's supposed to do, and it will do it. But it was told what it was supposed to do. It was told to use this methodology. It was told to look at this report, which says this is the means for determining. We hired the man who came up with the methodology that we're told to use. We're audited a number of times, including 2007, when we have a long-seam failure susceptibility analysis going on, and no one tells us anything. Now, after the fact, they say, well, the Baker methodology didn't apply to brittle pipe, when, in fact, if you look at page 2 and page 8 of the Baker report, it clearly anticipates that there is you look at the Baker Keifer article 2393 in the record page 4, it assumes that this type of pipe is brittle. Counsel, I know you've got a lot more to cover. There's a lot in the case. What is important to me may be important to you to respond. You talk a lot in your briefing about the audits that were done. The government says all we looked at, and I can be corrected in a few minutes, were written materials. In your IMP manual or in anything else, you talked about the very, in your briefing, very detailed statement of how we dealt with evidence of leaks. Do you incorporate in something in writing that was reviewed by the agency that says exactly what you did, that we'll go through this decision tree, if there are leaks, we'll look for fatigue and whatever else it says, and otherwise it's not considered to be a matter of susceptibility? Is that in something that was reviewed and in some way not objected to by the agency? In the record, it shows how we complete figure 4.1. We do it over and over again. You look at 12, 21, 22, 29, 59, 2390. It's replete in our records. They were there for three months in 2007 when we were in the process of doing a longitudinal seam, phasers. And what they would have seen is what you're telling us now you follow, which is if you have leaks during the hydrostatic testing, don't be concerned about it unless A and B, and A and B is not what happened in this case. You follow figure 4.1, and as Dr. Kuechner explains, that you look at brittle cracks. If they fail, you've taken care of them. Okay. But all I'm really asking is, it's not what you did, but did they review this summary or very detailed statement on the part of Exxon and not object to it? I can't tell you what my own knowledge and what the record shows of what they reviewed. I can tell you that Exxon's records show that they completed these analyses. And we're not relying, make clear, we're not relying upon just not citing us during inspections. We realize that you can't require an agency to cite you, and you get a free pass if they don't cite you. And the case they rely upon is the Millard Refrigerated Services by the D.C. Circuit. You have to have some affirmative conduct. What we're saying here is the affirmative conduct is the adjudication and the rule announcement that you're supposed to use Dr. Kuechner's methodology, and then that it's part of the Baker Report. And we go to the report, and it gives us the means, we complete the means, and it's an added fact in this case that they audited. And this is not an insignificant feature to our integrity management program. They raised no problem because there was no problem. We followed the rule. Now they're trying to say that because it's brittle pipe, you don't use the Baker. If they want to change the rule and say we're going to ditch the Baker Report, the agency can do that and announce a new rule. But what they cannot do is say this is what you should do. We do it. We do more than we're required. We hire the man who came up with the methodology to make sure we're doing it right, and then we get hit with violations and penalties. I think my time is up. Thank you, counsel. Thank you. May it please the Court, Your Honors. Katherine Dorsey on behalf of Respondents. This is not a bait and switch here, as EMCO suggests. The regulations specifically set out that an operator is EMCO, the ExxonMobil Pipeline Company. As ExxonMobil suggests, the regulations set out that an operator is to consider and assess the risks in its baseline assessment. That is clear language in the regulation, and that language required the operator here, ExxonMobil, to take account of the manufacturing type of the pipe. This was pre-1970 ERW pipe, which is known in the industry to be susceptible to longitudinal seam failure. Counsel, I think you're ---- Sorry, Your Honor. Where does it say to do that in the Baker decision tree or Dr. Keefer's research? Where does it say you have to do something different than what they did? Well, the Baker decision tree and the Baker report is not incorporated in the regulations, but it is set forth as guidance for the industry on how to determine seam susceptibility. Counsel, in your brief, you called it helpful guidance. I think what you're telling us, it's unhelpful guidance if you rely on it. I don't think that's right, Your Honor. We ---- Well, counsel, before you ---- the broader question is, you're talking past each other. You're saying the regulation controls and you're supposed to be alert to various evidence of leaks. Exxon says, or EMCO if you prefer, says that absolutely. We don't want the leaks either. It costs us a lot of money. And so we're following the methodology that you posted on your website, sponsored by you, that says to do it this way. And I don't know if the twain is ever going to meet, but it does seem to me you're wedded to this Baker report. And you can't just keep going back to the regulation and say, au contraire, the broader requirement is to be safe out there. And you weren't alert to the safety problems that were exposed by the hydrostatic testing. And so it really isn't the Baker report is helpful guidance. It's irrelevant, you're saying. No, I'm not saying that at all, Your Honor. The Baker report does provide guidance to help operators determine seam susceptibility. And if you read that report in the context, it says, if a seam-related in-service or hydrostatic test failure has occurred on the segment, the segment is considered susceptible. And it also says, that's at page 20 of the Baker report, it also says the segment could be susceptible even without any seam-related failures at page 25. So what EMCO is trying to use is use the one flow chart in the Baker report as a safe harbor. But that is not, the Baker report is not a safe harbor just because you follow that. The whole point of having these performance-based regulations is that the operator gets to consider the particulars of its pipeline and the specific risks, and within the scope of the regulations, use the best methods, the best technology to assess those risks and make its risk assessment. What I don't understand, what says that they didn't consider, and all it says is they have to consider. It doesn't say they have to actually do anything after they consider, but that's a different topic for a different day, perhaps. Once they consider... Well, if they consider it, then it has to base the assessment. Right. So it just has to make an assessment. And they did consider and assess. But that's beside the point right now. What I want to know is where it says what you're saying now that they should have done, how would they have known this, that they needed to do something different than what they did that was what you all told them to do? Well, the Baker report and the Kiefner paper both direct that if there is, in the text of those reports and papers, that if there is a history of seam failures, and here in the latest hydrostatic test in 2005-2006, there were 11 seam failures. Right. And you all knew about that in your 2007 audit. That is incorrect, Your Honor. Why is that incorrect? The 2007 audit was a very high level that was system-wide for company-wide for EMCO, and it kind of checked boxes to make sure they had an IMP, they had an integrity management program. It was not drilling down, looking at the nuts and bolts of that. Okay, so assuming you all didn't know it, even assuming you didn't know it, that once they know that there's 11 seam-related failures in 2005 and 2006, what are they supposed to do differently when figure 4.1 says that, A, the conditions are not present to require them to do something differently? Where do they know to do something differently? Based on the Baker report in whole, read in context, and the regulations, Where in the regulation does it say to do something differently? It says to consider all the, in 195.452E1, it says to consider all the risk factors that reflect the risk conditions on the pipeline. The operator must consider, it lists a number of factors, but it must consider the results of the previous integrity and system assessment, the pipe size material, manufacturing information, and seam type. Right, but they did consider that in light of the best state-of-the-art test. I'm not sure, where does it, what did it say they were supposed to consider in some different manner than they considered? Well, again, the Baker report, if you look at the text, it tells you if a seam-related in-service or hydrostatic test failure has occurred, the segment is considered susceptible. Basically here, the flow chart, even if you consider it in the general context and the agency doesn't disagree that that is a general scheme, it's not a safe harbor to ignore specific risks found on your pipeline. Here, ExxonMobil had a trend of, over time, they were testing the pipeline, there were increasing failures at lesser pressure over time in these hydrostatic tests. But what would the company know specifically that it needed to do differently than it was doing? How would they know? If they hired the state-of-the-art expert, how would they know to do something differently than what they're doing? The regulations and the text of the Baker report itself told them they should have considered this pipeline susceptible to seam failure because of the in-service leak and the hydrostatic test failure in 2005-2006. It dictated the answer. It did. You didn't mean just consider it, whether it is. You mean consider that it is. That's a different answer. No. Rather than just consider in the abstract. Your Honor, I disagree. It says they have to consider, but they also must base the assessment schedule on all risk factors that reflect the risk conditions on the pipeline. Here, the 2005-2006 test failures, 11 of them showed that that pipe was susceptible to seam failure. And they can't rely on the flow chart in the Baker report to close their eyes to that risk just because there was no evidence of preferential seam corrosion or pressure cycling fatigue. Let me mention another part of the Baker report which precedes the chart. The means, the means, the word the is pretty particular, of determining whether or not the seam of a particular pipeline is susceptible to failure are illustrated in Figure 4.1. Some other commentary. Figure 4.1 represents a decision tree that allows one, by supplying appropriate data on a given segment, to determine if a seam integrity assessment is required. You get to the flow chart. I made my pagination wrong. You then get to this sentence that you love, that you've cited so much in your brief and have done it several times here. I don't know what Exxon or any other pipeline company is to make of this argument. Obviously you have the regulation and your client has said this is the way to interpret that regulation when you're actually on the ground, literally in the ground, trying to figure out what to do. I'm not saying the interests of your agency aren't entirely appropriate, as the problem in this case shows. But this guidance, helpful guidance, I say in quotes, says a certain way to go. And I don't think that single sentence is nearly as altering in what is said to be the means of determining. I mean, I've asked a question similar to that before, and you've answered, so I don't know if I'm adding anything to this discussion. But do you have anything to add to this discussion, why this very direct language in the Baker Report isn't, in fact, what it means? I have several responses, Your Honor. One is we don't think even the agency found that even applying the flow chart, that EMCO didn't apply it correctly here. And I would refer the court to the agency's accident report, which is actually not in the appendix, but it is found at Certified Index II, Exhibit B, Appendix E. And it goes into a lot of detail discussing why this was a misapplication of the flow chart in the Baker Report. Let me ask, is this a new argument? I don't remember. I thought the argument here is the flow chart isn't a safe harbor. Have you argued in your brief that they applied it wrong? I think that is in there, and it is in the agency's final decision. That's not what we're talking about. What did you bring to this court? We said that they – we argued on several levels, Your Honor, that the Baker Report doesn't override. Right. But did you argue they applied the guideline flow chart improperly? I believe we did say that they misapplied the flow chart. Where? Well, don't – if I might suggest, you might tell us later. I think it's in there. But if – in any case, Your Honor, another point is that the regulations plainly instruct that operators are supposed to revise procedures and assess risk in accordance with technologies as they change. And so the Baker Report is obviously – and the flow chart in there – is also not a stagnant thing that they can't, as technologies change and industry guidance improves, that they can't keep going back to that. So you're saying the Baker Report is becoming obsolete over time and so that therefore you have to go beyond the Baker Report? Where does – where did you tell people that ahead of time? There is something in the Baker Report that – well, that's in the regulations that they are to consider up-to-date guidance and industry notice. But where did you say that you thought the Baker Report was no longer up-to-date and therefore they needed to do something else? The Baker Report in itself – I don't have the citation, but it does say in the Baker Report that the flow chart has been modified in Section 9, I believe it is, of the Baker Report. There is a sentence in there. So that indicates also that the Baker Report is not. This is not a relevant modification to the flow chart, is it? I'm asking you where you told the people beyond notice the Baker Report will not give you the best state-of-the-art information as you consider because technology is changing. We want you to augment that with such and such other things. Well, that's in the regulations. Where in the regulations? The regulation number – I'm not sure. I apologize, Your Honor. I'm not sure I have it. There is a specific provision. I can send a letter to the Court that says – It says the Baker Report is becoming obsolete. No, no, no. So you can't rely on it and you need to do something else? No, that just – it's a general instruction that the operators are to consider current industry knowledge and, you know, incorporate best practices and current industry knowledge. Do the regulations specify to operators how they are to determine whether the pipe is susceptible to longitudinal seam failure? Do the regulations themselves tell that? The regulations do not provide instructions on that. Again, that is something that is – the Baker Report as a whole provides instructions on that. So then we're not really deferring to your interpretation of the regulations then because the regulations don't answer the question, so there's no hour deference applicable, is there? Well, the regulations – we do rely on them for the part that the operator must base the assessment schedule on all risk factors and tells an operator what to consider. And if an operator considers those risk factors, it will be able to reach that conclusion of whether a pipe is susceptible to seam failure. So to that extent, I think there is hour deference on our interpretation of those regulations. But the regulation doesn't say what the answer is to the question. It just says you must consider a list of factors. And to all knowledge, these factors were, in fact, considered. They just didn't get the same answer that you wanted them to get. Well, the regulations don't tell an operator how to comply, but that doesn't mean an operator cannot comply with the regulations in here. Which gets me to my question. It would be possible, wouldn't it, for an operator to be in compliance and be completely oblivious to the Baker Report? Which is to say you could read the regulation and comply with the regulation without the helpful guidance of the Baker Report. That is correct, Your Honor. What is it we're supposed to defer to the agency on? I'm really honestly perplexed as to what interpretation you've made about the regulation that we're supposed to defer to. I think it's our interpretation about how the 195.452E1, about how an operator is to consider and... How to consider. That an operator is to consider how we've discussed that, how we've interpreted that provision, that they need to consider and base the risk assessment on these specific factors. Based it on. Where did you tell you have an interpretation of a regulation? And this is in every single agency interpretation case we have like this. You'll have a regulation, and then you have manifested your interpretation somewhere that someone can go and look it up. Where is your manifested interpretation of the regulation so that someone ex-ante could look it up and know how to comply with the agency's interpretation of the regulation? Well, we think in part the plain language of the regulation speaks for itself, but there are also agencies... Okay, well, then we're not deferring at all then. As a first step, yes, we think the language on this is clear, but there are agency decisions certainly that have applied this provision. But you're not pointing the Court to any specific interpretation of the regulation to which we must defer in this case? Normally you would have our agency position is this, and we've posted it here, and you must defer to us, Court. And that's what I'm waiting for you to tell me, and I don't think you have that. No, I mean, I think of this one provision, the plain language here. So you're not seeking our deference then? You say it's the plain language controls. Well, there's other provisions here, which Exxon has not challenged, but there were, you know, nine violations, only six of which EMCO has challenged. And so on those, if there were any questions, it might be a question of deference. But on this main E1 point, you do not believe we're supposed to defer to some interpretation you have. You believe the plain language says you win. Yes, and then there's obviously a deference in the arbitrary and capricious review of the agency's application of the regulations. Let me ask about the three that aren't being contested. Exxon can say if they agree. That's not sufficient in any way to uphold the order. I mean, those are irrelevant to the issues that we're dealing with. Sorry, Your Honor, I missed the first part of your question. The three that they are not objecting to, the three of the nine findings, are in no way relevant to what we're talking about in that since they're not contested, they do not uphold your action by themselves? Yes, I think those three are just not any, are, we don't, since they're not challenged, they're completely separate here from the issues we're discussing. So we're not doing anything on those. We're not doing anything on those, but those, because they stand, are not in any way sufficient to uphold the action of the agency. Only just on those three items, not on the rest, because they're very independent, discrete violations. Okay. If I understand your question. Well, I guess it's not very clear, but your answer seemed to understand it. I mean, there are, I can go through the separate violations. Oh, no, no. You've got too little time left. Let's not worry about that. I just want to make sure nobody's talking about them, that there's nothing in them that we need to worry about. What is it that after these audits, I think Exxon to some extent is a bad word to use, conceded, but is not relying on the effect of the audits. But it seems to me that the regulation itself is talking about an agent, an operator has to schedule a way to deal with the possible problems with the pipeline. And it seems to me they came up with a manual. Is that what a schedule is meant, that they're supposed to set out ways in which they're supposed to deal with problems with pipeline safety and specifically the things that we're talking about? And they did come up with an IMP manual or whatever they called it that set out the methodology that they're talking about. So they complied with the regulation if that's what the regulation is talking about. Nobody's assessing that, meaning your agency is not assessing that in any way that matters, apparently, from what you're saying. So for 10 years, 15 years, they're operating in a certain way. They've set out exactly the way they're going to operate. And then when there's a problem like this, all of this past history, I think you're saying is in a way you use the phrase safe harbor, but is in no way relevant to our evaluation, that this is the way they've operated, this is the way you could have been aware that they were operating. It seems very much consistent with the Baker Report with whatever caveats you want to add. But now because there was a problem, they get this enforcement action. Well, Your Honor, I think most of the time these kind of problems do get discovered in inspections by the agency. That is, most of these violations that are found by the agency aren't found as a result of an accident. They are found as a result of inspections. And the inspection that happened in 2007 was at a very high level, did not drill down to the particulars, and certainly did not look into how an integrity management program was applied in this case. So now a later inspection could have maybe gotten to that. Another side of this is an audit would have looked at what they said and said we'll follow the guidance given by the agency and would have said looks good to me. But here there was, you know, the agency, there was no requirement to tell the agency, and the agency didn't even know of those 11 scene failures in the hydrostatic testing in 2005, 2006 when it did the audit. Otherwise, you know, they certainly would have looked into that and raised it with the company. There is a lot of back and forth between the agency and the company in applying these regulations. Well, you say now they definitely would have. We don't know what they definitely would have done at the time because we don't know the significance of those. Now they're significant. Would they have been significant at the time? Well, you don't have much time. Do you have some closing comment for us? I have three questions.  So you wanted me to ask the questions before you make a closing comment. Sure. If we determine the company did not violate subsection E1 for failure to consider various risk factors, this is not foreshadowing, it's assuming argument, though, do you agree that the rest of the contested violations should be overturned? No. Why not? We believe that 4, 7, and 8 are wholly separate from the scene failure susceptibility determination. Are those the ones we put to one side already? No. Or are these the ones in? 5, 6, and 9 they haven't challenged at all. 4, 7, and 8 are unrelated, as we explained in our brief, to the scene failure susceptibility, and they have raised no specific challenges to the regulation. Could they support the damages? Yes. 4, 7, and 8 that they haven't raised specific challenges to? Support in part the damages. If you look at the penalty order, the agency breaks down by each violation and assigns an amount to each of those. So we could easily figure out how much money is left. Yes, that is correct, Your Honor. If we rule E1 no-go and then we leave intact 4, 7, and 8, we know how much is owed. That's correct, Your Honor. Okay. Second question. Regarding whether the agency based its decision on substantial evidence, what evidence did the agency have to contradict the testimony of Dr. Kueffner? The agency relied on its own experts who testified at the hearing. Kueffner didn't testify. He presented an affidavit. And the agency's experts, you can read the hearing transcript also, which disputed Dr. Kueffner's affidavit in part because they found the brittleness of the pipe, which I think he said was kind of an oddity in this case, and one of the agency's responses was that no, brittleness is common in these ERW pipes. Where does it say these employee experts' qualifications? I'm familiar with the record on this, but I don't see that we know anything about these experts to make them experts. It's not on the record. There was no qualification as experts, but it was agency personnel who work and have experience in these and by day-to-day operations know that. So they're day-to-day operations and they weren't challenged. Your position is they weren't challenged in their expertise at the hearing and so it doesn't matter? That's correct. I mean, they weren't challenged. Okay. And I just want to be clear on that. Nobody raised an objection that they weren't qualified. That's correct. So they were qualified to contest it, so there would be evidence in the record to support the brittleness is an exception theory as substantial evidence. I think that's correct, Your Honor, but also this hearing was an administrative hearing. It wasn't quite like a district court proceeding, so it was more like an open discussion where the parties presented that. We deal with a lot. It's not just the D.C. Circuit that has lots of these. I know where, Your Honor. The company was compelled to, okay, my last third question is, what in the record tells the company that the company was compelled to label the pipeline as susceptible to seed failure? We've asked this question in various ways throughout this argument, but what in the record tells them that they're compelled to label it as susceptible? Those 2005-2006-11 hydrostatic seam failures, that in connection with the fact that they had this ERW pipe that's already known to have problems, and the 1984 leak passed. Those are the facts that compel it. Where is the rule? Where does it compel it? I'd say it's 195.452E1, again, that the operator must base the assessment schedule on all risk factors that reflect the risk conditions on the pipeline segment, and then they are also required, if the pipe is susceptible, determined susceptible in the regulations, then to do a seam assessment every five years. So the risk factors themselves compel the answer that it's susceptible. That's correct, Your Honor. And so I can read these risk factors and see that it's susceptible, and I don't need any interpretation or deference. It's just on its face they compel it. Well, those risk factors would compel a conclusion in the agency's view that... Got it. And so here, just in closing, I see I'm out of time, Your Honors, that here, because of those seam failures, increasing number of seam failures over time at reduced pressures compelled the operator here to make a conservative assumption that these pipes were susceptible to seam failure and should have taken the necessary precautions under the regulations. And we would ask this Court to affirm the final order. Thank you. Thank you. Each one of Your Honors raised questions I'd like to try to deal with very quickly. Justice Southwick, when you talked about unhelpful guidance, let me make the fair notice argument that what they're saying is Dr. Kieffer doesn't understand his own report when he says brittleness is presumed of this pipe. And they say, well, no, Dr. Kieffer doesn't understand that brittleness should be, that Kieffer methodology shouldn't be used for brittle pipe. And yet the report says and Dr. Kieffer says all of this. But there could be some disagreement between Kieffer and somebody else looking at a report. Kieffer could say this is what I meant, and somebody else could say, well, this is what it says. Isn't that possible? That's possible. What I'm saying is, though, if the man who came up with the methodology and who helped write the report doesn't understand it and can't apply it, then there's no fair notice. I'm not saying that the agency can't disagree with Dr. Kieffer, but I'm saying there's no fair notice in that situation. I'm sorry. Oh, no, no. I interrupt too much. It does seem to me, though, that that is just evidence. And he's at this stage in your employ, and that has to be factored in as well. And the good offices and the good intentions of Dr. Kieffner really aren't in play here. But I do see to me that it's not controlling what he thought was the right way to interpret this. I understand. But if it's unhelpful guidance, then that raises a fair notice problem. As far as the compliance and considering, the Court can look at Record Excerpt 7. You can look at 2384, which is in the supplemental appendix. And you can look at the 444-page manual, which is 1653, that shows all the things that Exxon did to consider. So, yes, Judge Elrod, we are arguing that we considered these, and that's all that the regulations required. As far as HYDRA tests, then make it clear that 4.1 says if you have HYDRA test failures, then you take certain paths down 4.1. There's nothing in 4.1, which is the means for determining seam susceptibility failure, that says HYDRA test somehow that if you have a failure, that somehow disqualifies you, and you have to call it seam susceptible. Yes. Counsel, one thing that concerns me, picking up on what opposing counselors said, is it's one thing to have the Baker Report. It's one thing to have a methodology. And that's not small potatoes, to mention a vegetable or whatever that is we were talking about last argument. I've heard that potato's early, John. This is not a loaded potato. This is just a question. I digress. It does seem to me that what the real problem here is, from the government's viewpoint and their experts' viewpoint, what you found as HYDRA static testing, Baker Report notwithstanding, was troubling. And an expert should have known it was troubling. Yeah, you have the methodology and whatever else you have wisely and ably talked about, but you've got to go beyond that for the regulation and decide, is there enough here that Exxon should have done more? And in their expertise, the agency says you should have. What about that? These HYDRA test failures are something that are expected and part of the 4.1 analysis. And what you look at, and this is paragraph 11 of Dr. Keefner's supplemental affidavit. Yes, you're going to have some failures in HYDRA tests because if there are brittle cracks that are big enough, then they will fail. If they're not big enough, then they're not going to grow over time. And what you're looking at is are you going to have time-dependent defects? In other words, cracks that are going to grow because of fatigue. When you pressure cycle, you take the pressure up, you take the pressure down. This pipeline didn't have it. They always looked at that. Or do you have corrosion at the seams? And if you have those kind of things, then you can tell that your pipeline, and that's what Dr. Keefner does, he calculates the life of the pipe and says, then you've got to put in a safety factor and you've got to take action when you're getting close to the end of the pipeline. So it's not troubling when you have HYDRA tests leaks. That's something you're looking for because you're taking care of brittle cracks that are going to fail, and then the other brittle cracks, if they're there, they're small enough that they're not going to grow and end up causing the pipe to fail before the calculated life of the pipeline. So there's nothing troubling about those. That's part of the analysis. And what Dr. Keefner says and what the Baker Report says is you've got to look at the causes of those and determine whether that's something that tells you that something's going to happen in the future, that you need to make your continual assessment and you need to use either a HYDRA test or you need to use an inline seam tool. So they're not troubling. They're part of the process and part of the analysis. My time is up. The violations, each one of the violations, if I may just add this, all the violations were challenging. If we had run the TFI inline tool 10 months earlier, there would be no violation. All of them fall if there is not seam susceptibility because in that situation you're not required to do either HYDRA testing or ILI tools on a five-year, 68-month basis. You wouldn't agree with the distinction opposing counsel made on three of the challenges? You haven't made necessarily a separate argument on them? Do you think all six rise and fall on this argument? All six of them fall if the five is not seam susceptible. The other three are very different kinds of violations that we don't challenge. Thank you. We have your argument. Thank you. Thank you both.